Before we start with our cases for today, I have the privilege of making a motion myself. Brian will you stand up and come to the podium please? I move the admission of Brian Weisenberg who's a member of the bar and is in good standing with the highest court of California. I have knowledge of his credentials and I'm satisfied he possesses the necessary qualification. So I have the privilege of performing his wedding. I was gonna say marrying him but then I thought that might sound wrong. So I performed his wedding which was a great joy. He's been a wonderful law clerk. I mean he's gonna go down. It's one of my favorites. Other three clerks pretend you didn't hear that. And if I say that you're swearing in, feel like it's real. I'm really gonna miss him. He's been a wonderful clerk. He is so incredibly hard-working, thorough, shockingly efficient. I have absolutely no question that he will be a productive, useful, and valuable member of our bar. So I would ask my two colleagues to vote on my motion and I hope that it will be granted. What do you say? Well I've heard he's also an excellent karaoke singer, a fan of Medieval Times and for those reasons, and for many others, I support the motion. It's so overwhelming. So Brian, felicidades y bienvenido al bar. Okay. On to our first case for today. 2017-2168. May it please the court. This case presents a question of whether the Department of Commerce has the authority to suspend liquidation back to the one of the regulation or dispositive for the merchandising question. So you argue that this case is a case of first impression, correct? That's correct. And the trial court said as much in her opinion as well. Can you tell us why? Because the regulation seemed to cover suspension of liquidation in various settings and could you explain that point? Yes. I can start with the regulation and then talk about the AMS case. Yes. The regulation itself, we're looking mainly at parts K and L. And part K tells us that initially the Commerce looks to the language of the order, the anti-dumping order, and can then take the step of looking at what's in part 225K1 and consider at that stage whether or not the underlying sources from the original investigation, the petition, the initial investigation, the determinations by the International Trade Commission and the Commerce Secretary, those sources that were and are available that relate back to that initial investigation. And if the K1 sources are dispositive under L, that has a certain ramification. And we'll get to that in a moment. If the K1 sources are not dispositive, you move then to K2, which is a more searching and a more sort of open-ended analysis. Is that a formal inquiry, scope inquiry at that point? K2 is, you must initiate a formal scope inquiry under K2. Is that what we have here? It is not. And the trial court agreed that there was no need to go to K2. The K1 sources were dispositive. The trial court sustained Commerce in that regard. And under the Section L of the regulation, we know that this final scope ruling was issued under Part D of the regulation, which allows the Secretary to issue final scope rulings based upon the K1 sources and the states. When there is a ruling where further inquiry is warranted is the beginning of Part E, and it talks about the initiation of a scope inquiry. And so here we have a ruling under D, which for suspension purposes, when we look at suspension, which is covered by Part L of the regulation, it's L3 that addresses Part D. And L3 does address when there's a scope inquiry, what would happen with suspension. It doesn't address what will happen if there is no scope inquiry. And as we've explained in our briefs, Commerce's reasonable position, in our view, is that in that circumstance, when the order and the K1 sources are dispositive, suspension, basically the view is that the merchandise has always been within the scope of the order and that the order is not unclear in the way it was in the AMS case. What about the regulatory history that says that, you know, in circumstances analogous to this, at least as I read it, in circumstances to an analogous to this, because there hasn't been any collection of duties or that Commerce itself or Customs doesn't think that these goods are included because there's been no suspension as of yet. Yes, Your Honor. That regulatory history, the best place to look at it in the briefs is page 18 and 19 of the final reply brief with United Steel. Just because in different sections of the different briefs and in the Drug Court's opinion, there's snippets of it. But on page 18 and 19 of the reply, it's given a more fulsome, it's a longer excerpt. And so that's page 18 and 19 of docket number 27. And on page 18, it starts with the regulatory history, and this has to do with paragraph L of the regulation, which has to do with suspension. And it goes to paragraph L. A number of commenters have urged that the department should suspend liquidation when it initiates a formal scope inquiry, if liquidation has not already been suspended. And this suspension should apply to all unliquidated entries. So there were, there was a proposal that even when there's a formal scope inquiry, all unliquidated entries, regardless of the timing, should be suspended. Obviously, Commerce rejected that proposal because we know if there's an initiation of a formal scope inquiry, you cannot suspend backwards. It's only prospective after the initiation of the scope inquiry. There's a different rule if there's suspension already in place, and that's when it's continuing. But this paragraph in the beginning tells us that there was this proposal that was rejected for unliquidated entries. And if you go down further into this language, and it's about nine lines up from the bottom, the sentence starts, formal initiation of a scope inquiry by the department represents nothing more than the finding by the department that it cannot resolve the issue on the basis of the plain language of the scope description or the clear history of the original investigation. And when you consider that Commerce is focusing on the scope inquiry, and if you look at this whole passage, scope inquiry comes up for at least four times, and the notice issue that is being flagged by Commerce in this passage is in the context of when there's a scope inquiry. Because if the product is under the K-1 sources, the position of Commerce is that the order is clear for the purposes of notice. Because the K-1 sources all existed at the time of the investigation. The order is written here. So how do importers then have notice? Is it through the publication of the notice of initiation of an anti-dumping duty investigation that's made in the Federal Register? Yes, Your Honor. Ultimately, if you go back to when this anti-dumping order was entered on the Federal Register, and all the other related K-1 sources are all publicly available. The investigation, the documents related to that investigation, and the determinations by the ITC, and they're discussed in the scope ruling aspect of this case. That's where we talk about those documents and grapple with why it's correct that K-1 sources are dispositive. So the regulatory history, as both parties have argued, is seeking to strike a balance. Because there's the interest of the domestic industry on the one side and importer-exporters on the other side. And for situations under K-1, Commerce determined that you didn't have the strong cutoff date for suspension that's only prospective. They didn't explicitly have such a cutoff as they do for K-2. Because the K-1 sources are available, there is notice. Then why didn't Commerce write into the regulations what happens in this type situation where you don't have a formal inquiry, and yet you have entries that have not been liquidated. They're hanging out there. They've been deemed to come within the scope of an anti-dumping duty order as a result of this application for a ruling. Your Honor, I wish I could give you a good answer to that question. We know that they didn't. We also know that in AMS, this court said that in not every case, Commerce will be allowed to do this retroactive suspension. But I'm confused. I agree completely with Judge Reyna's question, and that's what's troubling me in this case. But to take it even a step further, since the government has basically admitted that the regulation itself is silent on this point, why would you be entitled to hour deference on this litigation-postured adopted position? Well, it wasn't a litigation-postured position. I mean, it was Commerce's position in the scope ruling. They adopted this position at the administrative stage in resolving an administrative inquiry. So it's not sort of a late-arriving argument. It's part of their scope ruling analysis. Why would you be entitled to hour deference when you're not actually interpreting a regulation of your own, but rather supplementing it? We view it as an eminently reasonable interpretation. Of what? Which words are you interpreting? In the context of the fact that... I think you admit that the regulation is silent on this point? It is, Your Honor, yes. The regulation is silent. I'm really perplexed as to how you're interpreting it. Taking into account that if the items had been suspended previously, then that would continue under the law. They weren't here, but as we explained in our briefs, customs is not the ultimate decider of whether or not a product is in scope. And so for the question of whether something is suspended in the first instance when it hits the border shouldn't be dispositive one way or another of whether or not suspension can apply to that entry. And if we... So the way Congress views it is when something hits the border, if it's not... Well, you don't actually have any answer to my question. You're just going to move on. I'm okay with that, but I just want to acknowledge what's happening. Go ahead. I would just... It's the context. It's the context of the other parts of ELL, such as that suspension continues when it's already in place. That here we view that these items have always been within the scope of the order pursuant to the K-1 sources, and so they should be treated as if they were always in scope. And that... So it's ELL? It's those words in ELL is what you're interpreting here, and that's what gets our deference? Which word in ELL is it? So in ELL, in more than one instance, because there's three... Well, there's four subparts, but in one, two, and three, in each one of them, it says that if suspension has already occurred, it will continue. Didn't already occur here. That's what makes this case... I'm not actually interpreting the words if suspension has already occurred? Exactly. Okay, so you just told me what I'm not interpreting with your instruction. What am I... What are you interpreting with your instruction? I mean, our deference requires that you be interpreting your own regulation. If you would like to supplement that regulation because you failed to address some part, you can do that. There's a whole process for it, but it's not our deference. That's what you're interpreting. I respectfully submit that the interpretation here is consistent with and a reasonable approach to this. There is a gap in this... But do you have... Just to answer the question, which is, what language do you think you're specifically identifying as being the language that you're interpreting? In addition to the fact that suspension would continue if it had been suspended, and that considering the fact that customs isn't the ultimate... Doesn't determine if something's in scope. So it's somewhat whether or not... Looking at section, I guess it's L3. What language is it? Or is it the absence of language? And it can also be inferred in our view from the fact that in the instance of a formal scope, then we know what the role is. And so by not explicitly addressing when there is no formal scope ruling... It's the opposite. It's just... It can be the opposite. It doesn't have to be the opposite. That's your problem there. I agree that we go to L3, and it specifically refers to D, and that's just a ruling by application, the K1 ruling. Then it goes on to F4. It joins them together. It speaks about suspension and liquidation under paragraph 1.1 and 1.2 of the same section. Those go to the formal inquiry. And it says nothing else other than about what happens in the situation where you have a D situation and you have entries that are not liquidated. And your interpretation may be reasonable at some point, but where did you get it? On what basis are you... And your argument, your acknowledgement that this is silent, but that's... You stop there. You don't go on and argue that the secretary was wise enough to address formal inquiries and the fact that they do that and not address the application rulings that that says something, but you don't do that. You don't give us a basis for review. You don't base it on the statute, do you? No, that's another... Actually, that was my next point. Perhaps you could have, but you didn't. We did in our briefs refer to the suspension provision in the statute, which is 19 U.S.C. 1671 B.D. 2, which, in this case, we know that's the initial suspension for the products that were being entered in scope from... You said 19 U.S.C. 1671? That's not actually cited in your book brief. I'm on the citations page. I was going to figure out what page you made this argument on since you told Judge Rainey you did, but at least it's not in your table of authorities. Okay, you're actually... You've used all your time, all your rebuttal time, and you're beyond that. I need to hear from the other side. You can think about that and respond. I'll restore some rebuttal time. Thank you, Your Honor. Mr. Marshak? Yes, Your Honor. Good morning. Since we've been talking about retroactivity, I guess I'd address that first before I talk about the merits, but there is a relationship between the two. And there, as Judge Rainey was saying, L3 talks about this. So L3 talks about a situation when there's no formal scope inquiry. And there, then it talks about there's been no suspension of liquidation, and it talks about initiation, but it doesn't talk about where there's been no suspension of liquidation and there's been no initiation. But when you look at the comments to the regulation, and you look at the end of the comments, and we think we're precisely in the comments to the regulation here, what Commerce said, and I'll quote, would be extremely unfair to importers and exporters to subject entries not already suspended to suspension of liquidation and possibly duty assessment with no prior notice. And there's nothing more than a domestic... And then it goes on to say, because when liquidation has not been suspended, customs at least, and perhaps the department as well, have viewed this merchandise as not being in scope or important, justified in relying on that view. At least, I mean, you've read the same things you've read. So move on. What else you got? I agree with you on that. What we have there, this is the perfect situation. We are here, Customs sent a request for information to our client. We were entering the merchandise in a provision that was not listed in the order, even though we know that's not dispositive, but we're 0.90, was not listed anywhere. Just to be clear, I don't agree with what you said, because what you were reading, you don't, you skipped over the part where it says the recent explanation for sanction is speaking about a formal initiation of a scope inquiry. The part that you read deals with a scope inquiry. That's not what we have here today. What we have here today is a situation under D. So it's under the regulations because... D is not a formal scope inquiry. Correct, Your Honor. But what D is, it's a formal scope, it's a final scope ruling. Yes, but it's not a scope inquiry. What you were reading here, just to be correct here, what you were reading deals with a formal scope inquiry. Yes, but if you look at the purpose of the regulations, it talks about the impact on the importer, something being very unfair to the importer. When you have a formal scope inquiry, and that's because what a formal scope inquiry does, does it not enlarge the anti-dumping duty order? No, Your Honor. I believe the purpose of scope is that the anti-dumping duty order always covered this merchandise. And that's when it falls within the scope. If you want to enlarge it, you're into anti-circumvention. But the idea of scope is that this has always been within the scope, and it's always been within the scope, either under the plain meaning... But then it's a degree of clarification, correct? Yes, it's a degree of clarification. If it's K1, it's clear. And under K1, if the language is clear, then what unfair disadvantage was placed on the importer? The importer knew all along, it seems to me, that they had a problem here. No, Your Honor. The importer, in this case, our importer did not know it had a problem. And it didn't know it had a problem because under the trade usage, helical spring lock washers did not include our importer's merchandise. Our importer saw helical spring lock washers. It's entering the merchandise in a provision that does not encompass helical spring lock washers. Customer agrees to allow it to continue entering. And when our client looks at the petition and looks at the original, the ITC investigation... I find it difficult to understand just from the record here, how any importer of any helical washers would not have been alerted at the initiation of this anti-dumping duty investigation that maybe they had a problem. Because these are not referred to in the trade as helical spring lock washers. Our client was buying this merchandise from Petitioner. Petitioner was not selling the merchandise as helical spring lock washers. Petitioner's information and offer to our importer was not referred to as helical spring lock washers. Our importer and its trade information did not refer to this product as helical spring lock washers. Helical spring lock washers, if you look at Petitioner's, what was in the petition, Petitioner says all of the lock, all merchandise, all helical spring lock washers that we produce at our production facility, and that's the only production facility, are produced to asthma standards. Ours are not. Petitioner said that all helical spring lock washers are trap... All the helical spring lock washers that are produced is produced to asthma standards, that they're all trapezoidal. Ours are not trapezoidal. Those are not produced to asthma standards. It's really a different class of merchandise. Can I ask you a factual question? What is the difference in time frame that we're looking at here in terms of if we were to agree with the government? How much time are we talking about? We're not talking about that much time, Your Honor. We're talking about practically a discrete period where, because our entries were not being suspended, it's a discrete period that have captured entries where there's, because of the duty rate for China, or the China-wide rate, there's a substantial amount of money involved. So it's a very short period of time. Of how much time? Do you know? Going back... I'm going to balance. I'm guessing about a year. Okay. I'm guessing that that's what's in effect, because as soon as, again, it was practically, as soon as there was a problem, what our client did, even though the customs said you could enter the merchandise, our client was prudent and stopped because they realized there was a problem. Before, our client had no idea it was a problem. And again, this gets into the merits and what's clear and what's dispositive. And we believe that what Commerce did is when they said K1 was dispositive, they really ignored the information, a lot of the information that we placed on the record showing it wasn't dispositive. Is it close? Yes. What we're saying now, we realize we probably, we claim that we should win on K1, but we believe that K1 is relatively close. But when you look at the K1 factors, when you look at the petition, it's talking about asthma, it's talking about continuously about trapezoidal, it's talking about asthma, it's talking about what the petitioner was making in the United States, and they were saying everything they're making is asthma, trapezoidal. And our client is not, doesn't consider its merchandise helical spring lock washers. But the scope order doesn't mention trapezoidal, right? The order doesn't mention trapezoidal, but when you go to the K1 factors, and we believe there's federal circuit case law, the Patterson and the Sango case, that as to whether something is clear, you look at what's in the K1 factors, and you say, wait a second, the K1 factors talk about different specifications. Our specifications aren't mentioned. They talk about trade usage. So our client, they've been importing this product for a long time. And this is a case where they were really shocked. And customs basically agreed. Customs could have said, okay, you guys are totally wrong. I'm suspending liquidation because it's clear. Customs agreed it's not clear. And customs agreed you could continue to enter, even though our client prudently did not, because customs knew this was something that had to go to commerce. And because of that, our client is being hit with retroactive duties. Now, the impact of retroactive duties on the importer, I think that's what commerce was very, very concerned about when it wrote these regulations. They talked about an unfairness to the importer by assessing duties retroactively. When merchandise comes in in good faith, and the importer isn't paying dumping duties, when you go retroactive, the petitioner isn't hurt. The merchandise is in the country. The harm has been done. The only thing it does, it injures, it has a tremendous retroactive monetary impact on an importer who has been exercising good faith in bringing the merchandise in. And that's what the regulation was talking about. Extremely unfair to importers and exporters. Here, commerce may say, it's dispositive. And we believe that's wrong because everything we put on the record shows it wasn't dispositive. But at the very least, it wasn't clear. Now, dispositive and clear are two different things. Something could be dispositive, where there's a lot of ambiguity, there's a lot of unclarity, but you come out at the end of the day, it's dispositive because it's 51%. Maybe commerce did that, but that doesn't mean it's clear. And when you look at AMS, you're talking about something that's clear, something that's not fair. And that's the purpose of the regulations. That's why the regulations struck this balance. And it's just very, very important. When you're talking about the need to evidence supports commerce's finding that the washers are contained within the scope, that part of your appeal as well? Yes, our appeal is that commerce... Why? Why though, given that you admit that your washers are helical in their appearance and function and they fall within the literal language of the order, why would their commerce's determination then not be supported by substantial evidence, which is a very deferential standard that we have to apply? We know that, but commerce in its decision, it said the plain meaning of the order wasn't dispositive. They went beyond the plain language, certain helical spring lock washers, and commerce went into the K1 factors. And we believe you're required, and I think there's some case law saying, unless something is absolutely clear, you're required to go into the K1 factors. And here, commerce didn't say the scope of the order was clear, unambiguous. Commerce went and said, let's look at the K1 factors. And once commerce went to the K1 factors, which we believe they're required to do, we believe that commerce misinterpreted the K1 factors. So commerce is required to go to the K1 factors in any type of scope ruling? Not necessarily. I think if the language of the order is crystal clear, if you have crystal clear specifications, the plain meaning controls. Or there could be some situation where the K1 factors just undeniably support the plain language of the order. But we're not in that situation. When you look at the K1 factors in this case, and you look at our brief, you look at our presentation to commerce, you're going to see, we looked at the petition carefully, we looked at the ITC carefully, we looked at trade usage carefully. And there's a lot of support for our client's position and our position that the term helical spring lock washers is a term of trade, not just take helical spring lock washers. But you take helical spring lock washers, and that does not encompass our client's merchandise. They were not... You may be right if I had to over-review, but I don't. That's a question of substantial evidence again. So you're saying we introduced evidence, that's not your burden. Your burden is to overcome the substantial evidence on the other side. We believe we did. We believe that we submitted enough evidence as to, in the K1 factors, if you look closely at the evidence we submitted, if you look closely as to what petitioner was saying about all of its lock washers... The evidence you submitted are K2 factors. We believe we submitted K1 factors when we submitted the information... No, but the evidence you're talking about, you're arguing about today, those are K2 factors, trade usage, the term of art in the industry, channels of trade. The ArcelorMittal case talks about trade usage as being a K1 factor. It doesn't go to K2 if you're just talking about trade usage. But again, the usage in the trade at that time, the term helical spring lock washers... Do you want to save your time for rebuttal? Yes, Your Honor. Very good. Mr. Snyder, I'll give you two minutes of rebuttal time. Thank you, Your Honor. I'll do it as quick as I can. Just to go back to the statute, Your Honor, if you look at page eight of our reply brief, docket number 18, we do discuss the statute 1671BD2. We state that commerce are reasonably concluded that it has discretion to order the suspension of unliquidated entries that should have already been suspended in this circumstance. And citing that statute, it's in a couple other places in our reply brief on page two and a footnote and on page 18 as well. In terms of the AMS case, page 1344 of that decision, the last page of the decision has very interesting language about the word clarity or clarified, because AMS is all about whether or not the order is clear. And how is that word used in that decision is really what this case is about. How is this case different or similar to AMS? And in that case, first of all, this court looked to the regulations that apply when there's a scope ruling that is initiated and held that commerce erred when it did not initiate a formal scope ruling. That was commerce's error. That's the language of the AMS decision. That holding doesn't apply here. Even the trial court here doesn't hold that we should have initiated a formal scope ruling. So AMS said in a situation when an order is unclear, you must initiate a formal scope ruling. And what it meant in that case, which had very different facts than this one, a substantial transformation analysis of goods from another country to determine whether those goods should be treated as goods from China because they were processed and manufactured there, which is very different and more searching than just looking at the K1 sources, which is what occurred here. Also in AMS, there's a case cited for the proposition that not every time commerce resolves a scope dispute will it lead to this result that AMS led to. And that case is the high-end case, if I'm saying it correctly. And the parenthetical for that case that this court provided explained that in high-end, commerce provided a clarifying instruction for that case. And in that context of that case, that clarification wasn't... Mr. Snyder, you are way beyond the time, the extra time I gave you, and you're now reading me a parenthetical from our opinion. So I got to ask you to sit down. Thank you, Your Honor. First, just to get to AMS, we believe when you look at AMS, Your Honor, AMS talks about clarity. It doesn't talk about substantial transformation being different from a regular scope. And it when the order is not clear. And we believe the order here is not clear on its face, and it's not clear on its face, and customs recognized it's not clear on its face, and our client shouldn't be believed it was not, in good faith, believed it was not clear on its face. And the Court of International Trade also recognized that the order was not clear on its face. And when it's not clear on its face... Counselor, you were pointing the court's unfairness to the importer's argument that you had. AMS addresses that. It also addresses what happens, in a sense, to hold otherwise would permit importers to potentially avoid paying anti-dumping duties on past imports by asserting unmeritorious claims that the products fall without the scope. Importers, this is Judge Allure in that case, importers cannot circumvent anti-dumping orders by contending that their products are outside the scope of existing orders when such products are clear to their scope. I totally agree with that. But in our case, the facts are totally different. The scope of the order was not clear. The scope of the order is clear. I know you say it's not, but Commerce found that the scope of the order was clear. Okay. So, hold on. So, if the scope of the order is clear, that means that importers will put on notice as to the particular entries that, if anything, that perhaps they have a potential problem. Those, there's entries out there that were not liquidated. Don't you agree that under, let's say that the scope determination was correct, don't you agree that to allow those entries into the country without paying the anti-dumping duties where you have a clear scope order would be harmful to the domestic industry? The entries have come in. The entries have been sold. Domestic industry, you know, was already injured. The fact that you're going to penalize an importer by retroactively assessing duty on something. The anti-dumping law seeks to prevent that. Right. But the importer here, and I think the judge, you know, Judge Shultz-Groves recognized that the order was not clear on its face. The importer was acting in good faith. And when you look at the analysis, I mean, we're saying- That's what the court determined, but that's not what Commerce determined. Commerce determined that we- We're looking at Commerce's determination. But again, Commerce determined that the K-1 factors were dispositive, but that doesn't mean the K-1 factors are clear in the sense that an importer should recognize that the K-1 factors are clear. That's precisely what it means. I don't believe so, Your Honor, because the Commerce- Look, we believe Commerce's decision was wrong. But if an importer is bringing in merchandise and the importer is not selling that merchandise as a helical spring lock washer, and the domestic producer is not selling that merchandise as a helical spring lock washer, and there's a lot of information on the record that that merchandise is not a helical spring lock washer as discussed in the petition, it's a very- At the least, we believe we're right, but it's a very close case. And that's not clarity. Customs, you could say it's clear, but in no way do we believe that there's clarity here as to what the scope of the- Okay, thank you, Mr. Marshak. I think we have your argument. Case is taken under submission. We can move on.